### DE BAUR v. LEHIGH VALLEY R. CO.

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

No. 54.

1. **Master and servant ⚖═180(1), 204(1)—Federal Employers' Liability Act abrogates fellow-servant doctrine, but saves defense of assumption of risk.**

   The federal Employers' Liability Act (Comp. St. §§ 8657–8665) abrogates the common-law fellow-servant doctrine, by placing the negligence of a coemployé on the same basis as the negligence of employer; but it saves the defense of assumption of risk in cases other than those where the violation of a statute enacted for the safety of employés may contribute to the injury.

2. **Master and servant ⚖═137(4)—Engineer required to use ordinary care to stop on discovering employé's peril.**

   Under the federal Employers' Liability Act (Comp. St. §§ 8657–8665), if an engineer of a train discovered an employé on the track in a position of peril, it was incumbent on him to exercise ordinary care to stop his train and prevent the accident.

3. **Master and servant ⚖═286(31)—Evidence of engineer's negligence as to flagman sitting on track held insufficient to go to jury.**

   In an action for death of a flagman, struck by a train drawn by an engine with the tender first, *held*, that the court properly refused to submit the case to the jury on the ground of plaintiff's failure to sustain the burden of proof of establishing negligence, in that the engineer should have seen the deceased, who was sitting on the track apparently unconscious of danger.

In Error to the District Court of the United States for the Western District of New York.

Action by Esther De Baur, as administratrix, etc., against the Lehigh Valley Railroad Company. From a judgment dismissing the complaint, plaintiff brings error. Affirmed.

The proofs in this case established that the defendant below operated a railroad running into Buffalo, with two main tracks running east and west, the southerly one of which is the east-bound main track, and the northerly one of which is the west-bound main track. West of Rush Street station, on this railroad, there is the Haslop railroad crossing. On August 16, 1919, at about 4:30 p. m. on a bright, sunny day, the husband of the plaintiff below, was struck at a distance of about 18 or 20 car lengths distant from this crossing, and while on the east-bound track. Just west of this point the tracks curve sharply to the southwest. The deceased was a member of a crew of a work train which was engaged at the time, in grading for an extension of a siding between Rush station and Rochester Junction, both of

which were on this main line of the defendant below. The crew were engaged in operating a steam shovel in loading earth on the work train. The train was on the east-bound main track, and it became necessary, from time to time, to move it out of the way to let the east-bound trains go by. For this convenience, the work train was either backed into a siding located at Rush station, or a siding at Rochester Junction, whichever one happened to be nearer to the location of the work train.

The deceased was assigned to duty as a flagman. He was furnished with a red flag, and at the time in question was instructed by his conductor to take a position to flag the rear end of this work train. The conductor says: "The order I gave him was when we were coming back to get around on that curve far enough to protect us if there was anything coming this way." The deceased was located, when struck, on the curve or about 1500 feet nearer the train than the position which it is claimed he should have assumed in order to have a clear view of the straightaway track on which the east-bound trains would approach before reaching the curve. When seen, just before he was struck by the engine, he was seated on a rail of the track, with his arms on his knees and his head bent, as if asleep; at least, apparently unconscious of the approaching danger. A train, with an engine tender first, approached the west around the curve. It was a local, and ran from Manchester to the P. & L. Junction. There were no turntables there, and it became necessary to run the train back (on the return trip) with the tender first. The train was made up of about 38 cars. In this position, the engineer was stationed on the left-hand side, facing the east, instead of the right-hand side. The fireman was on the right-hand side, except when firing his engine. This made the view of the engineer in approaching the Rush station considerably limited because of the curve of the track.

The head brakeman sat on the tender, not because he was ordered to do so by a superior, but for reasons of his own. He said it was a hot summer day, he had been sweating, and he wished to cool off. The train stopped at the Hall signal west of Rush station. This signal was located about half or three-quarters of a mile from the point where the deceased was subsequently struck. It was around the curve on the straight track. The signal at Hall showed red, which was an indication that there was something in the block ahead. The train, then, after stopping, started up and passed the signal. It did, however, stop long enough to honor the signal, and then went ahead in accordance with the rules of the company, proceeding at about 15 or 16 miles an hour. The brakeman, seated on the tender, testified that he could see but 7 or 8 cars ahead, as he came to the curve. He said he saw the work train near Rush, but saw no one on the track around the curve. The bank and treetops obstructed his view. His first sight of the deceased was about 6 or 7 car lengths away. He testified that as he came near he saw the deceased sitting on the track, with his feet inside the rail and his elbows resting on his knees, and head down on his arms. He at once called out to him, and when the deceased did not move he gave a signal to the engineer, who responded by blowing his whistle twice. The deceased did not move, and then a signal was given to stop; but it was too late, and the deceased was struck.

At the time the signal to stop was given the train was about one car length away. The brakes were applied when 3 or 4 car lengths away, but before the train stopped about 18 cars had passed over the spot where the deceased was struck. At the time the fireman was engaged in attending to his fire, and was stationed on the deck of the engine as the train rounded the curve. He was not in a position to, and therefore did not, see the deceased. It is also testified that whistles were blown for the Haslop crossing, two long and two short blasts, at the whistling post 800 feet from the point of accident; also that a whistle was blown when the train stopped at the Hall signal, about half a mile away from the point of accident.

The plaintiff below called as witnesses the conductor of the freight train which ran over the deceased, the conductor of the train to which the deceased was attached, the brakeman, who sat on the tender, and an employé in the office of her attorney, who testified to making certain observations at

the point of the accident about a year later. After this proof was submitted, the District Judge granted a motion for a nonsuit.

There was no evidence offered to show that the engineer saw the deceased at the time, or could have seen him, exercising due care, in time to have prevented the accident. All that is offered as to this is the testimony of an investigator, who said that he made certain observations, about a year later, while in a standing position at the point where the deceased was struck. There was no evidence to indicate in what space a train, made up of cars as the train in question was, with the kind of brakes and condition of the track, could have been stopped. Counsel for the plaintiff below contends that the jury should have been permitted to conclude from the foregoing facts that the deceased was ill and unable to take care of himself at the time of his death, and that by the exercise of ordinary care and due diligence those in charge of the train could and should have observed the deceased in his predicament and have stopped the train in time to have avoided his death.

There was no evidence to determine whether the deceased was asleep or unconscious at the time. He reported to work in the morning, apparently in good health, and assumed his duties. There was evidence, however, that of his widow, who said that he suffered from cramps of the stomach for a period of a year before the accident, and that at such times, when suffering from these attacks, he would bend up and place his hands upon his stomach.

Hamilton Ward, of Buffalo, N. Y. (Irving W. Cole, of Buffalo, N. Y., of counsel), for plaintiff in error.

Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y. (James McCormick Mitchell, of Buffalo, N. Y., of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge (after stating the facts as above). [1] The action is brought under the federal Employers' Liability Act (Comp. St. §§ 8657–8665), and it is conceded that the plaintiff below is entitled to the benefit of the provisions of this act. If the defendant below was negligent, it must be predicated upon fault or neglect on the part of the engineer in charge of the train which struck the deceased. The statute permits a recovery against the carrier for death resulting in whole or in part from the negligence of its officers, agents, or employés. It abrogates the common-law rule, known as the fellow-servant doctrine, by placing the negligence of a coemployé upon the same basis as the negligence of an employer. It, however, saves the defense of assumption of risk in cases other than those where the violation by the railroad company of the statute enacted for the safety of employés may contribute to the injury or death of the employé. Seaboard Air Line v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

The negligent act of the coemployés stands to the question upon the same basis in predicating liability, as the employer's own negligence, and it will be noted that the act permits a recovery where the death results in or from the negligence of any of the employés of the road.

"We must look at the situation as a practical unit rather than inquire into a purely logical priority." Union Pac. R. R. v. Hadley, 246 U. S. 331, 38 Sup. Ct. 319, 62 L. Ed. 751.

[2] Upon what evidence here could negligent operation be predicated? The duty which was owed by those in charge of the train which

struck the deceased was that, when the deceased was first seen sitting on the track, the engineer was obliged to use all means at his command to stop the train. If he discovered the deceased in his position of peril, it was incumbent upon him to exercise ordinary care to stop his train and prevent the accident; but from the foregoing facts it is apparent that the engineer did all that could be expected of a reasonably prudent man under similar circumstances. He honored and obeyed the signals, blew his whistles at the customary points, and proceeded with a reduced speed of 16 to 18 miles an hour over the track in the block where the danger signal was shown. He did not know of the presence of the deceased in his position of peril until informed by the brakeman seated on the tender. His position in the cab was such that he could not see that far ahead on the track because of the embankment; also the curve. As soon as he was advised of the deceased's position, he did all that he could do to bring his train to a stop. But he received notice of the deceased's peril too late.

This testimony is offered solely as the plaintiff's evidence. There is no evidence to show that the deceased was, in fact, sick. We are only asked to infer that solely from his sitting, apparently unconscious of the approaching danger. Nor is there evidence to indicate that the engineer from his position, if exercising due care, could have seen the deceased in his position sooner than he did. The testimony of the employé of the attorney of plaintiff below, who says that he looked from the point where the deceased was sitting on the track and could see a mile, is not helpful; he was not in the position of the engineer, who was riding with the tender first, and thus his view obstructed. The witness' view was not the view that the engineer had, and therefore is not instructive. Nor is there evidence to show in what space the train, with a similar number of cars, brakes, and rail of like condition, could have been stopped.

The case differs very materially from Bragg v. New York Central R. Co., 228 N. Y. 56. 126 N. E. 253. In that case it appeared that the deceased worked 29 hours of continuous labor and fell asleep from exhaustion on the track. The track to the west of the deceased, from which the train which struck him came, was practically straight, with a slight grade, for nearly a mile, and on a bright sunny day, and with dry rails, the train came on and struck him. There was expert testimony indicating that the train could have been stopped, within the distance, in time to avoid the accident. These facts distinguish that case from the case at bar.

[3] The defendant below is liable if it could have avoided the death by the exercise of ordinary care after actually discovering his perilous situation. We think the engineer here did all that could be expected of him under the circumstances, and that the plaintiff below has failed to sustain the burden of proof of establishing negligence on the part of the defendant below, which would require the District Judge submitting this case to the jury.

Judgment affirmed.